## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**
Plaintiff

      v.                                                                  **Criminal No. 14-336 (DRD)**

**Edwin Maldonado-Burgos**
Defendant

### OPINION & ORDER

"The legal relationship between Puerto Rico and the United States is far from clear and fraught with controversy." United States v. Lopez Andino, 831 F.2d 1164, 1168 (1st Cir. 1987). The case at bar demonstrates the inherent difficulties that frequently occur when a court is called upon to discern the jurisdictional reach of a federal law in Puerto Rico. Today, the undersigned becomes the second District Judge to rule that 18 U.S.C. § 2421(a) does not criminalize conduct occurring entirely within Puerto Rico.

### I.     FACTUAL AND PROCEDURAL OVERVIEW

Edwin Maldonado-Burgos (hereinafter "Defendant") is currently charged with two counts of committing the following criminal conduct:

> knowingly transport[ing] . . . a then 18 year-old severely mentally disabled female **within** the Commonwealth of Puerto Rico, **which is a Territory and Possession of the United States,** in a school bus, with the intent that she engage in sexual activity constituting a criminal offense under the Laws of the Commonwealth of Puerto Rico. . . . All in violation of [18 U.S.C. § 2421(a)]. (emphasis provided).

Docket No. 11 (Indictment). The germane segment of the underlying criminal statute relied upon by the Government reads as follows:

Transportation generally
(a) In general.--Whoever knowingly transports any individual **in interstate or foreign commerce, or in any Territory or Possession of the United States**, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both.  (emphasis provided).

18 U.S.C. § 2421.  It should be emphasized that, pursuant to the indictment's own phraseology, the illegal transportation was effectuated entirely "within" Puerto Rico.

While the instant case was pending, however, a separate, unrelated case with a similarly phrased charge was dismissed on jurisdictional grounds by another judge in this district, the Hon. Gustavo A. Gelpí.  Relying on the plain language of § 2421(a), Judge Gelpí deemed the statute to be unenforceable with respect to intra-commonwealth transportation.  See United States v. Mercado-Flores, --- F.Supp.3d ----, 2015 WL 3764518 (D.P.R. 2015); and United States v. Mercado-Flores, Slip Copy, 2015 WL 4132355 (D.P.R. 2015) (denying motion for reconsideration).

Consequently, Defendant's counsel, ever vigilant of cutting-edge statutory interpretation, filed a motion to dismiss for precisely the same reasons relied upon by Judge Gelpí.  See Docket No. 85.  In fact, the only substance to Defendant's concise motion is an attachment, which is a copy of Judge Gelpí's aforementioned Opinion and Order.[1]  The Government responded with a noteworthy opposition and a subsequent addendum containing a recent First Circuit opinion.  See Docket Nos. 90 and 91.  The

---

[1] Defendant makes a half-hearted attempt to argue for a dismissal based on the Equal Protection and the "Privileges and Immunity" clauses of the constitution.  These fundamental constitutional principles have been argued in a skeletal manner without any case law or indication of the proper standard to be applied.  Thus, these arguments will not be considered.  See, e.g., Willhauck v. Halpin, 953 F.2d 689, 700 (1st Cir. 1991) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work. . . . Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.").

Government claims that Puerto Rico is a "territory" under § 2421(a); hence, notwithstanding Puerto Rico's commonwealth title, the statute should continue to apply to transportation occurring entirely within Puerto Rico. Thus, the time has now arrived for this Court to determine the jurisdictional reach of § 2421(a). Beneath the surface of this inquiry is the ever-evolving political relationship between Puerto Rico and the United States.

## II.      SYNOPSIS OF PUERTO RICO'S POLITICAL EVOLUTION[2]

"We readily concede that Puerto Rico occupies a relationship to the United States that has no parallel in our history." Examining Bd. of Engineers, Architects and Surveyors v. Flores, 426 U.S. 572, 596 (1976). Well over a century ago, on December 10, 1898, the United States "acquired" Puerto Rico from Spain by way of a peace treaty that ended the Spanish-American War.[3] In the aftermath of this acquisition, Puerto Rico "became subject to Congress' plenary authority under the Territorial Clause of the Constitution." Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 6-7 (1st Cir. 1992); U.S. Const. Art. IV, § 3, cl. 2.[4]

---

[2] For a more comprehensive presentation of this particular topic, the Court refers the reader to Mercado-Flores, --- F.Supp.3d ----, 2015 WL 3764518, which is Judge Gelpí's previously discussed Opinion and Order. Additionally, the Hon. Juan R. Torruella of the First Circuit Court of Appeals has also written extensively on the topic in a scholarly manner. See, e.g., Juan R. Torruella, The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal (1985); Juan R. Torruella, ¿Hacia Donde Vas Puerto Rico?, 107 Yale L.J. 1503 (1998); Juan R. Torruella, The Insular Cases: The Establishment of a Regime of Political Apartheid, 29 U. Pa. J. Int'l L. 283 (2007); and Juan R. Torruella, Ruling America's Colonies: The Insular Cases, 32 Yale L. & Pol'y Rev. 57 (2013).

[3] Treaty of Peace between the United States of America and the Kingdom of Spain, U.S.-Spain, December 10, 1898, 30 Stat. 1754.

[4] "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State." U.S. Const. Art. IV, § 3, cl. 2.

Following "[a] brief interlude of military control," on April 12, 1900, Congress enacted the Foraker Act, which established a temporary government in Puerto Rico. See 31 Stat. 77; see also Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 671 (1974). By virtue of the Foraker Act, the United States retained considerable control over the affairs of Puerto Rico and its citizens. Id. The subsequent stage in this political progression was the Jones Act, which was enacted on March 2, 1917. See 39 Stat. 951. The Jones Act arranged for the residents of Puerto Rico to have somewhat more authority over their local affairs, along with many of the United States' constitutional protections—albeit in a statutory fashion. The highlights of the Jones Act were the restructuring of the government in Puerto Rico, the creation of a local bill of rights, and the granting of American citizenship to residents of Puerto Rico.[5] Id. "The aim of the Foraker Act and the [Jones] Act was to give Puerto Rico full power of local self-determination with an autonomy similar to that of the states and incorporated territories." People of Puerto Rico v. Shell Co., 302 U.S. 253, 261-62 (1937) (citing Gromer v. Standard Dredging Co., 224 U.S. 362, 370 (1912); People of Porto Rico v. Rosaly y Castillo, 227 U.S. 270, 274 (1913)). Aiming to further increase Puerto Rico's autonomy, subsequently, on August 5, 1947, Congress enacted the Elective Governor Act, "which allowed the residents of Puerto Rico to elect their own governor, within the framework previously set by the Foraker and Jones Acts." Mercado-Flores, --- F.Supp.3d ----, 2015 WL 3764518 *3. "Up to this moment, under both Spanish and

---

[5] This statutory bill of rights, "which remained in effect until 1952, provided Puerto Ricans with nearly all the personal guarantees found in the United States Constitution." Examining Bd., 426 U.S. at 591. The two major exceptions were: "the right, under the Fifth Amendment, not to 'be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury,' and the right, under the Sixth and Seventh Amendments, to a jury trial." Id. at 592 n. 23 (citing Balzac v. Porto Rico, 258 U.S. 298, 306 (1922); and Section 2 of the Jones Act, 39 Stat. 951).

American control of the island, Puerto Ricans had never elected the island's governor."

Id.

The evolution continued on July 3, 1950, when the Federal Relations Act was enacted.  See Pub. L. 600 (specifically 48 U.S.C. § 731 *et seq.*).  "This legislation, offered in the 'nature of a compact,'" authorized the people of Puerto Rico to draft their own constitution, with the conditions that it "shall provide a republican form of government and shall include a bill of rights."  Examining Bd., 426 U.S. at 593; see also 48 U.S.C. §§ 731b and 731c.  "Congress approved the proposed constitution after adding, among other things, a condition that any amendment or revision of the document be consistent with 'the applicable provisions of the Constitution of the United States.'"  Examining Bd., 426 U.S. at 593-94; 66 Stat. 327.[6]  "The condition was accepted, the compact became effective, and **Puerto Rico assumed 'Commonwealth' status**. This resulted in the repeal of numerous provisions of the [Jones] Act of 1917, including the bill of rights that Act contained."  (emphasis provided).  Id.  "The congressional intent behind the approval of the Puerto Rico Constitution was that the Constitution would operate to organize a local government and its adoption would in no way alter the applicability of United States laws and federal jurisdiction in Puerto Rico."

---

[6] The Supreme Court noted that the "purpose of the condition" was explained by Congress:

"Applicable provisions of the United States Constitution and the Federal Relations Act will have the same effect as the Constitution of the United States has with respect to State constitutions or State laws. United States laws not locally inapplicable will have equal force and effect in Puerto Rico as throughout the States except as otherwise provided in the Federal Relations Act. Any act of the Puerto Rican Legislature in conflict with . . . the Constitution of the United States or United States laws not locally inapplicable would be null and void."Within this framework, the people of Puerto Rico will exercise self-government. As regards local matters, the sphere of action and the methods of government bear a resemblance to that of any State of the Union." S.Rep.No.1720, 82d Cong., 2d Sess., 6 (1952).

Examining Bd., 426 U.S. at 594 n. 25.

United States v. Quinones, 758 F.2d 40, 43 (1st Cir. 1985).  The Supreme Court also

recounted the congressional intent behind this legislation:

> [T]he purpose of Congress in the 1950 and 1952 legislation was to accord
> to Puerto Rico the degree of autonomy and independence normally
> associated with States of the Union, and accordingly, Puerto Rico "now
> 'elects its Governor and legislature; appoints its judges, all cabinet
> officials, and lesser officials in the executive branch; sets its own
> educational policies; determines its own budget; and amends its own civil
> and criminal code.' "

Examining Bd., 426 U.S. at 594.

Notwithstanding this "Commonwealth" label, the Supreme Court has continued to

recognize that Congress "is empowered under the Territory Clause of the Constitution .

. . to 'make all needful Rules and Regulations respecting the Territory . . . belonging to

the United States.'"  Harris v. Rosario, 446 U.S. 651, 652 (1980); see also Califano v.

Gautier Torres, 435 U.S. 1, 3 n. 4 (1978); Juan R. Torruella, The Supreme Court and

Puerto Rico: The Doctrine of Separate and Unequal (1985); Juan R. Torruella, ¿Hacia

Donde Vas Puerto Rico?, 107 Yale L.J. 1503 (1998); Juan R. Torruella, The Insular

Cases: The Establishment of a Regime of Political Apartheid, 29 U. Pa. J. Int'l L. 283

(2007); and Juan R. Torruella, Ruling America's Colonies: The Insular Cases, 32 Yale L.

& Pol'y Rev. 57 (2013); c.f. Quinones, 758 F.2d at 42 ("Thus, in 1952, Puerto Rico

ceased being a territory of the United States subject to the plenary powers of Congress

as provided in the Federal Constitution").   This is so because Puerto Rico is

"constitutionally a territory."  Franklin California Tax-Free Trust v. Puerto Rico, --- F.3d --

--, 2015 WL 4079422 *14 (1st Cir. 2015).  Furthermore, Congress "may treat Puerto

Rico differently from States so long as there is a rational basis for its actions."  Id. (citing

Califano, 435 U.S. at 1); see also United States v. Rivera Torres, 826 F.2d 151, 154 (1st

Cir. 1987) ("Congress can, pursuant to the plenary powers conferred by the Territorial Clause,[ ] legislate as to Puerto Rico in a manner different from the rest of the United States").  In the end, although still subject to the "territorial" clause of the constitution, Puerto Rico is currently a commonwealth.  With this historical background at the forefront, the Court may now proceed to scrutinize the statutes in play.

### III.   STATUTES OF CONSEQUENCE

#### A.  48 U.S.C. § 734

As Puerto Rico is not a state of the union, and is therefore not subject to all of the rights provided for in the constitution, which federal statutes apply to Puerto Rico? Congress has answered this question by including a general savings clause in the Federal Relations Act, which is codified at 48 U.S.C. § 734.  Section 734 pronounces "[t]he statutory laws of the United States **not locally inapplicable, except as hereinbefore or hereinafter otherwise provided**, shall have the same force and effect in Puerto Rico as in the United States . . ."  (emphasis provided).

Pursuant to the unequivocal language of this sweeping statute, all federal laws apply to Puerto Rico except those that are either "locally inapplicable" or have been explicitly rendered inapplicable by another statute of the Federal Relations Act.  As no other statute of the Federal Relations Act deems § 2421 to be inapplicable to Puerto Rico, the Court may disregard the second exception for the purposes of this motion. Understanding the "locally inapplicable" exception, however, requires further study.

At the outset, pursuant to judicial precedent, it is not for the Puerto Rico government to decide what is or is not "locally inapplicable"; instead, this task is left to

Congress.  "The questions of whether a statute applies to Puerto Rico and the meaning to be given to the phrase 'locally inapplicable' are matters of congressional intent." United States v. Acosta-Martinez, 252 F.3d 13, 18 (1st Cir. 2001) (citing Shell, 302 F.3d at 258), cert. denied, 535 U.S. 906 (2002)).  "If Congress has made clear its intent that a federal statute apply to Puerto Rico, then the issue of whether a law is otherwise 'locally inapplicable' does not, by definition, arise."  Acosta-Martinez, 252 F.3d at 18 ("There is little reason to think that [a] federal interest . . . would have been considered by Congress to be a matter for local veto power.").

"[T]he default rule for questions under the Puerto Rican Federal Relations Act is that, as a general matter, a federal statute does apply to Puerto Rico pursuant to 48 U.S.C. § 734."  Id. (citing Jusino Mercado v. Puerto Rico, 214 F.3d 34, 41 (1st Cir. 2000)); see also Colon-Marrero v. Conty-Perez, 703 F.3d 134 (1st Cir. 2012) (noting that "[t]he rule does not come into play, however, where Congress manifests an intent to exclude Puerto Rico from a law's coverage.").  Also of great significance, the First Circuit proclaimed the following:

> Although each statute must be examined independently to determine whether the "locally inapplicable" exemptions . . . apply, . . . we should point out that . . . this exclusion has been narrowly interpreted. Thus most federal legislation considered by the courts has been held applicable to Puerto Rico.

Rivera Torres, 826 F.2d at 155 (collecting cases).

Finally, the Court closes its introduction to § 734 by echoing the Supreme Court's sentiments in another jurisdictional case involving Puerto Rico, which occurred prior to its conversion to a commonwealth.  The Supreme Court stated what follows:

> [I]t is evident, from a consideration of the pertinent acts of Congress and the decisions of this court with respect to these acts, that whether Puerto Rico comes within a given congressional act applicable in terms to a 'territory' depends upon the character and aim of the act. Words generally have different shades of meaning, and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed.

Shell, 302 U.S. at 257-58 (citing Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 433; and Helvering v. Stockholms &c. Bank, 293 U.S. 84, 86-88).  The Court may now turn to the statute invoked by the Government.

### B.  18 U.S.C. § 2421(a)

Defendant is alleged to have committed the criminal conduct proscribed by 18 U.S.C. § 2421(a).  At the expense of repetition, the pertinent portion of the statute reads as set forth below:

> Transportation generally
> (a) In general.--Whoever knowingly transports any individual **in interstate or foreign commerce, or in any Territory or Possession of the United States**, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both.  (emphasis provided).
>  . . .

Defendant's argument is a jurisdictional one; thus, the Court directs its focus on the jurisdictional reach of the aforementioned statute.

A simple reading of § 2421(a) reveals that it criminalizes unlawful transportations that are carried out in the following circumstances:  (a) in interstate commerce, (b) in foreign commerce, (c) in any territory of the United States, or (d) in any possession of

the United States.[7]  It is crucial to recognize that, pursuant to the explicit terms of the statute, there is no interstate or foreign commerce requirement for intra-territory or intra-possession transportation.  Hence, if the alleged transportation occurred exclusively within a state (in intrastate commerce), then there is no federal jurisdiction; on the contrary, if the transportation occurred exclusively within a territory or possession, there *is* federal jurisdiction.  Thus, regarding this particular criminal conduct, federal jurisdiction is intended to be more pronounced in territories and possessions than it is in states of the union.

### C.  18 U.S.C. § 2423(a)

In order to better understand the jurisdictional scope of § 2421(a) (the general transportation statute), it is necessary to compare and contrast it with its sibling, § 2423(a), which is a specialized statute dealing with the transportation of minors.[8]  Notably, with one real exception, both statutes include parallel jurisdictional language.  18 U.S.C. § 2423 reads as follows:

---

[7] It is worth noting that, with respect to interstate commerce, the jurisdictional scope of this particular statute is not as encompassing as that of a few other criminal statutes.  For example, the general antitrust statute (15 U.S.C. § 1) only requires that the anticompetitive conduct have an *effect* on interstate commerce.  Moreover, another statute (18 U.S.C. § 844(e)) criminalizes threats that are made by the use of a mere "instrument of interstate or foreign commerce," even though the action occurred wholly in an *intrastate* fashion without there ever being any actual effect on interstate commerce.  See, e.g., United States v. Lopez, 514 U.S. 549, 551 (1995) ("Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat comes only from intrastate activities"); see also United States v. Gilbert, 181 F.3d 152, 157-59 (1st Cir. 1999).  Instead, the statute in play (18 U.S.C. § 2421(a)) is more circumspect: it requires that the actual transportation be carried out *across* state lines (interstate commerce), unless the transportation occurred wholly within foreign commerce or a territory or possession of the United States.  Thus, the fact that Defendant may have used an instrument of interstate commerce (the school bus) in an intrastate activity is insufficient to comply with the jurisdictional provisions of this particular statute.

[8] It should be recognized, of course, that § 2423(a) cannot apply to the instant fact pattern because the victim—although a mentally disabled 18 year old—is not a minor.  The Court discusses § 2423(a) strictly as a means to discern congressional intent with respect to the jurisdictional provision of § 2421(a).

Transportation of minors
(a) Transportation with intent to engage in criminal sexual activity.--A person who knowingly transports an individual who has not attained the age of 18 years **in interstate or foreign commerce, or in any <u>commonwealth</u>, territory or possession of the United States**, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life. (emphasis provided).
  . . .

For the purposes of this statute, the jurisdictional scope encompasses the illicit transportation of a minor occurring in the following manner: (a) in interstate commerce, (b) in foreign commerce, (c) in any commonwealth of the United States, (d) in any territory of the United States, or (e) in any possession of the United States. Thus, federal jurisdiction hinges on the existence of interstate or foreign commerce unless the transportation occurred wholly within a commonwealth, territory, or possession of the United States.

Hence, there is one subtle, but critical, distinction between §§ 2421(a) and 2423(a): one uses the term "commonwealth" while the other does not. Therefore, while § 2423(a) explicitly applies to intra-commonwealth transportation, § 2421(a) is silent on the matter. Up until 1998, however, the jurisdictional language contained in both of these statutes was virtually identical. The Court now moves to investigate the congressional act that created this distinction.

**D. Protection of Children from Sexual Predators Act of 1998**

Prior to the Protection of Children from Sexual Predators Act of 1998 (hereinafter "Act")—other than the fact that one applies to minors—there was no serious distinction between the jurisdictional language of §§ 2421(a) and 2423(a). <u>See</u> Pub. L. 105-314. The Act made significant modifications to both statutes. First, the Act expanded both

statutes to criminalize the mere attempt to violate their provisions.   Second, the Act significantly increased the statutory maximum terms of imprisonment for violations of both statutes.

However, as previously expressed, the Act created a critical distinction between the two statutes by adding the term "commonwealth" to § 2423(a), but not to § 2421(a). It is also worth noting that the Act also adds "commonwealth" to another related statute: § 2426.[9]   The congressional history of the Act reveals that these two "commonwealth" amendments were made by way of a unanimous floor amendment proposed by Senator Dan Coats.   Nevertheless, no proposal to add "commonwealth" to § 2421(a) has ever been made.   The "commonwealth" amendment was approved unanimously without any substantive discussion.[10]

---

[9] 18 U.S.C. § 2426 is set forth below:

> Repeat offenders
> (a) Maximum term of imprisonment.--The maximum term of imprisonment for a violation of this chapter after a prior sex offense conviction shall be twice the term of imprisonment otherwise provided by this chapter, unless section 3559(e) applies.
> (b) Definitions.--**In this section**--
>> (1) the term "prior sex offense conviction" means a conviction for an offense--
>>> (A) under this chapter, chapter 109A, chapter 110, or section 1591; or
>>> (B) under State law for an offense consisting of conduct that would have been an offense under a chapter referred to in paragraph (1) if the conduct had occurred within the special maritime and territorial jurisdiction of the United States; and
>> (2) the term "State" means a State of the United States, the District of Columbia, and any **commonwealth**, territory, or possession of the United States.   (emphasis provided).

[10] According to Congress' official website, the following was transcribed regarding the amendment:

> Amendment No. 3811 (Purpose: To make technical and conforming amendments)

> Mr. COATS. Mr. President, I send an amendment to the desk and ask for its immediate consideration.

> The PRESIDING OFFICER. The clerk will report.

> The legislative clerk read as follows:

## IV.   LEGAL ANALYSIS

Finally, having described the underlying facts of the case, while introducing a multitude of legal variables along the way, the Court may turn its attention to the difficult controversies that lie ahead.  First, the Court must determine whether § 2421(a) applies to Puerto Rico at all, given that the term "commonwealth" is absent from its terms.  If this inquiry is answered in the affirmative, the Court must then rule on whether Puerto Rico is a territory or a state for the purposes of § 2421(a) as the transportation in this case occurred wholly within Puerto Rico.  The Court proceeds to the first inquiry.

### A. PUERTO RICO IS SUBJECT TO THE PROVISIONS OF § 2421(a)

Prior to delving into this analysis, the undersigned echoes the sentiments expressed by both of our supervisory courts, the First Circuit and the Supreme Court:

---

The Senator from Indiana [Mr. Coats], for Mr. Hatch, Mr. Leahy, and Mr. DeWine, proposes an amendment numbered 3811.

Mr. COATS. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

On page 116, lines 22 and 23, strike ``territory'' and insert ``commonwealth, territory,''.
On page 118, strike lines 1 through 3, and insert the following:
``(2) the term `State' means a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United''.
On page 132, lines 9 and 10, strike ``that provide probable cause to believe that'' and insert ``from which''.
On page 132, line 13, strike ``has occurred'' and insert ``is apparent,''.

Mr. COATS. Mr. President, I ask unanimous consent that the amendment be agreed to.

The amendment (No. 3811) was agreed to.

https://www.congress.gov/crec/1998/10/09/CREC-1998-10-09-pt1-PgS12257.pdf

> As the Supreme Court lamented [many years] ago, it is "frequently the case" when examining the text of a statute for its applicability to Puerto Rico that "the language is not free of ambiguity, the purposes appear to be diverse and sometimes contradictory, and the circumstances are not fully spread upon the record for our instruction." <u>Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero</u>, 426 U.S. 572, 581, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). So it is here.

<u>Jusino Mercado</u>, 214 F.3d at 40.

As § 2421(a) was enacted well before 1952, there can be no doubt that the statute definitely applied to Puerto Rico prior to its commonwealth status. The difficulties arise, however, when considering whether Puerto Rico's post-1952 commonwealth standing renders § 2421(a) inapplicable to Puerto Rico. The First Circuit was confronted with an analogous controversy in <u>United States v. Villarin Gerena</u>, 553 F.2d 723 (1st Cir. 1977). Although the challenged statute in *Villarin* is not § 2421(a), this Court finds the analysis therein to either be controlling or at least highly persuasive.

In said case, Mr. Villarin, who was a member of the Puerto Rico police force, was charged and convicted for striking a citizen several times and arresting him without probable cause. Specifically, Mr. Villarin was convicted of violating 18 U.S.C. § 242, which read as follows:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any **State, Territory, or District** to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned

not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.[11] (emphasis provided).

On appeal, Mr. Vaillarin argued that the statute—which lacks the term "commonwealth"—does not apply to conduct occurring in Puerto Rico.

The First Circuit rejected the argument: "[t]he elevation of Puerto Rico to Commonwealth status did not render [§] 242 inapplicable." Id. at 725. In coming to such a determination, the First Circuit relied heavily on the previously mentioned general savings clause of the Federal Relations Act (48 U.S.C. § 734). Id.; see also Part III, Subsection A of this Opinion and Order.

The First Circuit next considered two interrelated arguments. Mr. Villarin noted that, despite the fact that § 242 was amended subsequent to Puerto Rico becoming a commonwealth, the statute still remained textually silent on its applicability to commonwealths and/or Puerto Rico. Id. at 726. Further, Mr. Villarin also noted that a related statute (§ 245) includes an explicit reference to commonwealths. Id. Mr. Villarin reasoned that these two facts clearly indicated that Congress intended to exclude Puerto Rico from the reach of § 242. In rebuffing Mr. Villarin's argument, the First Circuit cited one of their prior cases, which states the following:

> If, then, the Congress originally intended to apply the Act to Puerto Rico, it would seem clear, in view of [48 U.S.C. § 734] that the statutory laws of the United States not locally inapplicable shall have the same force and effect in Puerto Rico as in the United States, that **it was not necessary for the Congress to alter specifically all outstanding statutes thereto previously applicable in order to continue their effectiveness in Puerto Rico after it became a commonwealth in 1952.** (emphasis provided).

---

[11] The statute has since been amended.

Moreno Rios v. United States, 256 F.2d 68, 72 (1st Cir. 1958); see also Americana of Puerto Rico, Inc. v. Kaplus, 368 F.2d 431 (3d Cir. 1966), cert. denied, 386 U.S. 943 (1967).

Following the trail traversed by the First Circuit in *Villarin* leads this Court to come to the same conclusion in the case at bar: the controverted statute applies to Puerto Rico despite its textual omission of the term "commonwealth."  Prior to Puerto Rico becoming a commonwealth, § 2421(a) unequivocally applied to the "territory" of Puerto Rico.  Further, "[t]he elevation of Puerto Rico to Commonwealth status did not render [§ 2421(a)] inapplicable" in light of the general savings clause of the Federal Relations Act (48 U.S.C. § 734).  See Villarin, 553 F.2d at 725.  Moreover, the fact that § 2421(a) still does not explicitly mention "commonwealth" or "Puerto Rico," despite being amended after Puerto Rico's commonwealth era began, does not mean that Congress intended to exclude Puerto Rico from the scope of § 2421(a).  The fact that § 2423(a), the sister statute of § 2421(a), was amended to expressly mention "commonwealth" does not persuade this Court to rule otherwise.  In light of 48 U.S.C. § 734, "it was not necessary for the Congress to alter specifically all outstanding statutes thereto previously applicable in order to continue their effectiveness in Puerto Rico after it became a commonwealth in 1952."  Moreno, 256 F.2d at 72.  Additionally, the First Circuit has "consistently applied statutes advancing federal interests to Puerto Rico even when Congress has been silent on the matter."  Acosta-Martinez, 252 F.3d at 20 n. 6 (collecting cases).

Therefore, with respect to the narrow inquiry of whether § 2421(a) actually applies to Puerto Rico, "[w]hether Puerto Rico is now considered a Territory or a State .

. . makes little difference because each is included within [§ 2421(a)]." <u>Examining Bd.</u>, 426 U.S. at 597.  However, as § 2421(a) treats states differently from territories, the Court is not allowed the luxury of ending this matter without answering one more question.

### B.  IS PUERTO RICO A STATE OR A TERRITORY UNDER § 2421(a)?

Recapitulating, § 2421(a)—which this Court has just ruled applies to Puerto Rico—criminalizes illegal transportations that occur in interstate commerce, foreign commerce, territories, and possessions.  As the indictment in the instant case unambiguously avers that the charged transportation occurred "within" Puerto Rico, federal jurisdiction hinges on this Court finding Puerto Rico to be—strictly for the purposes of § 2421(a)—a territory or possession of the United States.  The preceding discussion regarding the political relationship between Puerto Rico and the United States effectively forecloses the possibility of Puerto Rico being found to be a "possession" or a "foreign" entity.  <u>See</u> Part II of this Opinion and Order.  Hence, if Puerto Rico is not a "territory" under § 2421(a), then the motion to dismiss the indictment must be granted.

As § 2421(a) applies differently to states and territories, this Court must take the next step and determine under which category Puerto Rico belongs.  "Whether Puerto Rico is to be treated as a state or a territory for purposes of a particular statute that does not mention it specifically 'depends upon the character and aim of the act.'" <u>Jusino Mercado</u>, 214 F.3d at 40 (citing <u>Shell</u>, 302 U.S. at 258 (1937); and <u>Cordova & Simonpietri Ins. Agency, Inc. v. Chase Manhattan Bank</u>, 649 F.2d 36, 38 (1st Cir. 1981)).

Adding to the complications, "[t]he term 'territory' does not have a fixed and technical meaning accorded to it in all circumstances, and thus Puerto Rico may be found to be included within one act whose coverage extends to territories of the United States and excluded from another." Kaplus, 368 F.2d at 436, cert. denied, 386 U.S. 943 (1967); see also Vega-Mena v. United States, 990 F.2d 684, 690 n.7 (1st Cir. 1993); Shell, 302 U.S. at 258 ("whether Puerto Rico comes within a given congressional act applicable in terms to a 'territory,' depends upon the character and aim of the act.").

Further, Puerto Rico's similarities to a state have not gone unnoticed:

> Under its Commonwealth status, "Puerto Rico, like a state, is an autonomous political entity, 'sovereign over matters not ruled by the Constitution.' " Rodriguez v. Popular Democratic Party, 457 U.S. 1, 8, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982) (quoting Mora v. Mejias, 115 F.Supp. 610 (D.P.R.1953)). While the creation of the Commonwealth granted Puerto Rico authority over its own local affairs, Congress maintains similar powers over Puerto Rico as it possesses over the federal states. See Hodgson, 371 F.Supp. at 60–61.

Quinones, 758 F.2d at 43. Also meriting attention, the First Circuit has deemed Puerto Rico to be a state for double jeopardy purposes. Lopez Andino, 831 F.2d at 1168. Additionally, although "Puerto Rico has . . . not become a State in the federal Union like the [50] States, . . . it would seem to have become a State within a common and accepted meaning of the word." Calero-Toledo, 416 U.S. at 672 (citing Mora v. Mejias, 206 F.2d 377 (1st Cir. 1953)). Moreover, the Supreme Court previously ruled that the Three Judge Court Act applied to Puerto Rico, even though the language of the act was limited to states. Id. Also meriting consideration is the fact that "Congress has instructed . . . courts to 'refrain from inferring that statutes which have limited effect

upon the fifty states silently apply with greater force to Puerto Rico.'" (internal citations omitted). Acosta-Martinez, 252 F.3d at 18-19.

In resolving this dispute, the Court turns to the First Circuit for guidance. As was the case for the previous controversy, the First Circuit has been confronted with an analogous argument. See Cordova, 649 F.2d 36. Once again, this Court finds the First Circuit's analysis to either be controlling or decidedly persuasive. *Cordova* dealt with a similar statutory scheme that is contained in the Sherman Act. Both 15 U.S.C. §§ 1 and 3(a) criminalize the same antitrust conduct with two major exceptions. First, § 3(a) reaches agreements "in restraint of trade or commerce in any Territory of the United States," while § 1 extends to agreements "in restraint of trade or commerce among the several states."[12]   Second, by the plain terms of the statute, § 3(a) extends to antitrust

---

[12] The Court limits its discussion to the relevant provisions of these Sherman Act statutes; however, in the name of clarity, the Court encloses the entirety of these subsections:

§ 1. Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

§ 3. Trusts in Territories or District of Columbia illegal; combination a felony

(a) Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.
 . . .

conduct that has an effect on intra-territory commerce, while § 1 requires that the antitrust activity have an effect on interstate or foreign commerce.  Thus, with regard to the Sherman Act, federal jurisdiction is more pronounced in territories than it is in states of the union.  Hence, the statutory scheme of the Sherman Act is quite similar to that of §§ 2421(a) and 2423(a).

In *Cordova,* the First Circuit ruled that Puerto Rico was no longer a territory under § 3(a) of the Sherman Act in light of the fact that Puerto Rico had evolved into a commonwealth.[13]  Moreover, the First Circuit—in disagreement with the district judge's ruling—found that Puerto Rico was a "state" for the purposes of § 1 of the Sherman Act. Interestingly, in coming to this conclusion, the First Circuit had to surmount a pre-commonwealth Supreme Court case that found Puerto Rico to be a territory subject to the provisions of § 3(a).  See Shell, 302 U.S. 253.  In doing so, the First Circuit stated, after careful study, that the change in Puerto Rico's political status rendered *Shell* inapplicable.

The First Circuit analysis commenced with the following inquiry: "whether the Sherman Act's framers, if aware of Puerto Rico's current constitutional status, would have intended it to be treated as a 'state' or 'territory' under the Act." Cordova, 649 F.2d at 39.  After considering the enactment of the Federal Relations Act and the promulgation of the Puerto Rico Constitution, the circuit court decided that Congress would have intended that Puerto Rico be deemed a "state" under the Sherman Act framework.

---

[13] To be precise, the Court notes that, subsequent to *Cordova* and *Shell,* § 3 of the Sherman Act was amended to include a second subsection related to illegal monopolizations.  Hence, when *Cordova* and *Shell* refer to § 3, it is the functional equivalent of what is now § 3(a).  Thus, for ease of exposition, the Court uses the modern § 3(a) terminology.

Therefore, in light of Puerto Rico's change in political status, the First Circuit found that Puerto Rico's Sherman Act coverage emanates from § 1, not § 3(a). However, the movement of Puerto Rico's Sherman Act protection from § 3(a) to § 1 has a monumental effect:

> The significance of this change from the point of view of the Sherman Act arises out of the fact that, as a general matter, the Sherman Act **ceases to apply to purely local affairs once territories become states**, leaving state governments free to enact various local antitrust laws broadly consistent with general federal policy, but occasionally divergent as to details. . . . The states are clearly able to adopt such variations as to purely local matters. And, **there is no reason of policy discernible in the Sherman Act for treating Puerto Rico differently, given a general Congressional intent to grant Puerto Rico state-like autonomy. We believe that there would have to be specific evidence or clear policy reasons embedded in a particular statute to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state.** Thus, it is fair to assume that the framers of the Sherman Act, had they been aware of the [Federal Relations Act] and subsequent Constitutional developments, would have intended that Puerto Rico be treated as a "state" under the Act, once Commonwealth status was achieved.

Cordova, 649 F.2d at 41-42.

Adopting the same analysis relied upon by the First Circuit leads this Court to the same destination.   The Court commences by testing "whether the [framers of § 2421(a)], if aware of Puerto Rico's current constitutional status, would have intended it to be treated as a 'state' or 'territory' under the Act."   See Cordova, 649 F.2d at 39. Considering—as the First Circuit did in *Cordova*—the enactment of the Federal Relations Act and the promulgation of the Puerto Rico Constitution, this Court is confident that Congress would have intended that Puerto Rico be considered a "state" for the purposes of § 2421(a).   Consequently, paraphrasing the First Circuit, this Court rules in the following manner:

> [T]here is no reason of policy discernible in [§ 2421(a)] for treating Puerto Rico differently, given a general Congressional intent to grant Puerto Rico state-like autonomy. [This Court] believe[s] that there would have to be specific evidence or clear policy reasons embedded in a particular statute to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state. Thus, it is fair to assume that the framers of [§ 2421(a)], had they been aware of the [Federal Relations Act] and subsequent Constitutional developments, would have intended that Puerto Rico be treated as a "state" under the Act, once Commonwealth status was achieved.

See Id. at 41-42.

However, in addition to the reasoning used in *Cordova,* congressional action allows this Court to make a stronger case that Puerto Rico was intended to be a state under § 2421(a).  The fact that the term "commonwealth" was added to § 2423(a), but not to § 2421(a), is a strong indicator of congressional intent.

> [I]t is a general principle of statutory construction that when " 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (C.A.5 1972)).
>
> Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 452 (2002).

Moreover, as the previously mentioned Protection of Children from Sexual Predators Act of 1998 made such significant changes to both §§ 2421(a) and 2423(a), it is difficult to argue that the failure to add "commonwealth" to § 2421(a)—while including the term in 2423(a)—was somehow inadvertent.  See Part III, Subsection D of this Opinion and Order (describing the changes made to §§ 2421(a) and 2423(a)).  Additionally, the fact that Congress also added the "commonwealth" term to § 2426 can only enhance this

finding.   Finally, the fact that this "omission" has still not been corrected seventeen years later further advances this Court's ruling.   The Court need proceed no further.[14]

## V.     DECISION

For all of the foregoing reasons, the Court hereby **GRANTS** Defendant's motion to dismiss the indictment.   <u>See</u> Docket No. 85.   Although finding that § 2421(a) does indeed apply to Puerto Rico, this Court rules that said statute does not extend to purely intra-commonwealth transportation.     Thus, the indictment—which is premised on conduct occurring wholly within Puerto Rico—cannot stand as a matter of law.   Of course, this does not mean that the alleged conduct is immune from criminal prosecution: Puerto Rico law enforcement authorities may charge Defendant in a local commonwealth court.[15]


**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 8th day of September, 2015.

> */S/ Daniel R. Domínguez*
> DANIEL R. DOMÍNGUEZ
> United States District Judge

---

[14] As previously noted, § 2423(a) specifically applies to the illicit transportation of minors while § 2421(a) is the general criminal transportation statute.   According to this Court's analysis, Puerto Rico is treated differently in both statutes: under § 2421(a), jurisdiction is premised on an interstate transportation requirement, while under § 2423(a), intra-commonwealth transportation suffices.   However, Congress "may treat Puerto Rico differently from States so long as there is a rational basis for its actions."   <u>Franklin</u>, 2015 WL 4079422 *14 (citing <u>Califano</u>, 435 U.S. at 1); <u>see also</u> <u>Rivera Torres</u>, 826 F.2d at 154 ("Congress can, pursuant to the plenary powers conferred by the Territorial Clause,[ ] legislate as to Puerto Rico in a manner different from the rest of the United States").   Although this issue has not been briefed, a heightened congressional concern for the transportation of minors for the purposes of sexual exploitation probably satisfies the "rational basis" requirement for the added federal protection.

[15] The indictment itself avers that Defendant violated Article 130 of the Puerto Rico Penal Code of 2012. The Court notes that the statute of limitations for said crime is twenty (20) years.   <u>See</u> Article 87(e) of the Puerto Rico Penal Code of 2012.